**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JARED CARTY and** | ) | |
| **PIMPORN CARTY,** | ) | |
| | ) | C.A. No. |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **STEEM MONSTERS CORP.** | ) | |
| **(d/b/a Splinterlands) (successor to Steem** | ) | |
| **Monsters LLC), STEEM ENGINE CORP.,** | ) | |
| **BLAIRE JESSE REICH, and MATTHEW** | ) | |
| **J. ROSEN,** | ) | |
| | ) | |
| Defendants. | ) | |

## AMENDED COMPLAINT

**COME NOW** the Plaintiffs, by and through their attorneys of record, Garibian Law

Offices, P.C., alleging as follows:

## NATURE OF THE ACTION

1. This is an action arising out of a dispute between Plaintiffs, Jared and Pimporn Carty, and

   Defendants, Steem Monsters Corp., Steem Engine Corp., Blaire Jesse Reich, and

   Matthew J. Rosen.

2. Plaintiffs' claims arise out of Defendants' fraudulent scheme, designed to deceive and

   induce Plaintiffs and others into purchasing cryptocurrency related digital assets under

   false pretenses and Defendants' fraudulent misrepresentations, as detailed and described

   herein.

3. Plaintiffs fell victim to Defendants' scheme and as a result, have lost and continue to lose

   extraordinary sums of money.

4.  Plaintiffs bring this action to seek recovery for all of the sums lost as a result of Defendants' unlawful conduct, and to recover all costs and expenses recoverable under applicable law.

## **PARTIES**

5.  Defendant Steem Monsters Corp. is a corporation formed pursuant to the laws of the Commonwealth of Pennsylvania with a principal place of business at 701 E. Cathedral Rd., Suite 45, PMB 321, Philadelphia, PA 19128.

6.  Steem Monsters Corp. was previously known as "Steem Monsters LLC," which was a Delaware limited liability company.

7.  Steem Monsters LLC was converted to Steem Monsters Corp. on November 21, 2018.

8.  Steem Monsters Corp. is a citizen of the Commonwealth of Pennsylvania.

9.  Defendant Steem Engine Corp. is a corporation formed pursuant to the laws of the State of Delaware with a principal place of business at 319 Locust Lane, Mount Joy, PA 17552.

10. Steem Engine Corp. is a citizen of the State of Delaware.

11. Plaintiff, Jared Carty, is an adult individual who resides in the Kingdom of Thailand. Jared Carty has resided in Thailand since 2005.  Prior to moving to Thailand, Jared Carty resided exclusively in the state of Missouri.

12. Jared Carty is a citizen of the State of Missouri.

13. Plaintiff, Pimporn Carty, is an adult individual who resides in the Kingdom of Thailand.

14. Pimporn Carty is a citizen of Thailand.

15. Jared Carty and Pimporn Carty (collectively referred to herein as "Plaintiffs") are husband and wife.

16. Defendant Blair Jesse Reich ("Reich") is an adult individual with an address of 319 Locust Lane, Mount Joy, PA 17552.

17. Reich is a citizen of the Commonwealth of Pennsylvania.

18. Defendant Matthew J. Rosen ("Rosen") is an adult individual with an address of 827 Parkridge Dr., Media, PA 19063.

19. Rosen is a citizen of the Commonwealth of Pennsylvania.

## JURISDICTION AND VENUE

20. This Court has original subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the matter is between citizens of different states and because the amount in controversy exceeds $75,000.00, exclusive of interests and costs.

21. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) because all of the defendants are residents of Pennsylvania.

22. Venue is also proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

23. Venue is also proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(3) because all of the defendants herein are subject to the Court's personal jurisdiction with respect to this action.

## BACKGROUND

### *The Splinterlands Game*

24. Splinterlands is an online platform, marketed by Defendants as a "game" which is accessible through its website at www.splinterlands.com. The website is operated by Steem Monsters Corp.

25. Splinterlands "players" are granted access to a base set of digital assets to play the Splinterlands "game."

26. The "players" use the digital assets, which are designed to appear to be playing "cards," to engage other players in "battle."  Upon information and belief, 80-95% of the active "battles" in Splinterlands are not "players," but are merely bots operated by Rosen and Reich.

27. Splinterlands players are then matched with an opponent and select a "team" of their "cards" to use from their own personal set.  After the players select their cards, the battle "will play out automatically based on the predefined game rules," as described on the Splinterlands website.

28. The winner of each battle is awarded "rating points" and "Dark Energy Crystals" (DEC), while the loser *loses* rating points.

29. "Dark Energy Crystals" ("DEC") are described on the Splinterlands website as "the official in-game currency of Splinterlands."  DEC are also described on the site as "a cryptocurrency token" that can be bought, sold and transferred.

30. These assets can also be traded on closely affiliated online exchange platforms, Steem Engine (www.steem-engine.com), Hive Engine (www.hive-engine.com) and Uniswap.

31. Despite the fact that the Defendants have marketed Splinterlands as a game, Splinterlands is anything but a game.  Most importantly, what the Defendants marketed and sold to Plaintiffs and other players was anything *but* what was described by Defendants.

32. First, despite the depiction of Splinterlands as a game, it does not involve any skill or random luck, as an ordinary game would.  To the extent there is any "randomness" associated with the game, it is determined by Defendants and originates from Defendants' servers, without being disclosed to any of the participants.

33. The "winners" of the Splinterlands "game" are picked and chosen at the will of Defendants, who themselves participate as players in the "game."

34. Despite Defendants' representation, Splinterlands is in fact *not* a game – but actually a multi-layered investment Ponzi scheme.

35. Defendants have devised a system where the more the players "invest" in Splinterlands, the more those players will win. Defendants unilaterally ensure that those players will win based upon the will of the Defendants - not due of any skill or luck attributable to those particular players.

36. Unbeknownst to the players and contrary to the representations made by Defendants, the Splinterlands "game" is set up so that Defendants pick who wins and who receives what digital "cards – like a casino where operators are able to decide which players receive which playing cards.

*Defendants Solicit the Plaintiffs to Purchase Digital Assets*

37. Plaintiffs initially became aware of Steem Monsters a/k/a Splinterlands in or around February 2019.  At the time, Jared and Pimporn Carty were interested in learning about, and potentially investing in, fully decentralized applications that operated on the blockchain.

38. In February 2019, Mr. Carty had an online chat with Reich, who claimed he was the CEO of Splinterlands.  During this chat, Reich described the online Splinterlands "game" and how it worked.

39. Reich indicated the SEC and Reich's lawyers had approved what they were doing. He made it seem that Plaintiffs would be buying an SEC-approved token.  This eventually proved to be a false representation.

40. In order to induce Plaintiffs into spending money on Splinterlands, Reich described Splinterlands as a *fully decentralized* application that was on the *blockchain* which would run off of nonfungible tokens (a significant and attractive characteristic).

41. Reich's representations were significant and material false misrepresentations upon which Plaintiffs specifically and justifiably relied to spend money in the Splinterlands game. Reich and Rosen knew this and made these misrepresentations in order to induce Plaintiffs and other would-be purchasers into spending money.

42. Contrary to these misrepresentations, the Splinterlands game was *not* decentralized, did *not* run off of the blockchain and did *not* run off of nonfungible tokens.

43. In June 2019, Reich provided Plaintiffs with an "investor deck" – in order to solicit their investment in a Splinterlands digital token offering.

44. Plaintiffs eventually invested more than $200,000.00 in Splinterlands, based on their justified belief that Reich and Rosen, in their individual capacities and in their capacities as representatives of Steem Engine Corp. and Steem Monsters Corp., were telling the truth about Splinterlands being an SEC-approved fully decentralized blockchain application.

45. Even before Plaintiffs knew about the Splinterlands game, Reich and Rosen had described the Splinterlands cards as "NFTs" before These statements also turned out to be complete lies.

46. Plaintiffs purchased in-game assets known as "cards" that had been previously described by Reich and Rosen as "non-fungible tokens (NFTs) with real monetary value" – and which Reich and Rosen represented to be fully decentralized tokenized cards stored on the blockchain.

47. Plaintiffs also purchased Dark Energy Crystals (DEC) that were described by Reich and Rosen as the "official in-game currency of Splinterlands" as well as "a cryptocurrency token" that could be "bought, sold and transferred."

48. However, the representations made by Reich and Rosen were *all* false.  Specifically, the statements were false in that:

   a.  The "cards" were not non-fungible tokens ("NFTs");

   b.  The cards were not recorded on the blockchain (rather, the cards' "serial numbers" were stored and/or could be found on the blockchain);

   c.  DEC was not a cryptocurrency token (in fact, DEC could only be bought, sold or transferred on Hive-Engine.com).

49. DEC is the vehicle utilized by Defendants to attempt to give any value to the Splinterlands "cards."  Players are able to "burn" their Splinterlands "cards" in exchange for DEC, which can be traded and sold for other cryptocurrency, such as bitcoin.

50. Upon information and belief, Defendants' primary purpose in introducing DEC into the transactions was to avoid certain governmental compliance obligations.

51. Plaintiffs' purchases in Splinterlands, some of which were made from Reich and Rosen individually, and some which were made from Steem Monsters Corp., were made in a series of cryptocurrency transfers, including (but not limited to) major transfers on or about 6/20/2019 (in the amount of $63,000), 7/3/2019 ($63,000), 10/20/2019 ($40,000), and 11/7/2019 ($24,000).  Plaintiffs also used their credit card for several purchases in Splinterlands.

52. Plaintiffs require discovery of information solely in the possession of Defendants in order to determine which of the purchases were made directly from Reich and Rosen and which were made from Steem Monsters Corp.

53. Defendants falsely represented to Plaintiffs the characteristics of the digital assets and that the digital assets had significant investment value, profit potential, and liquidity.

54. Plaintiffs' interest in the digital assets were based upon the specific representations made by Defendants as to the nature of the digital assets, as described herein. Had Plaintiffs known the true nature of the digital assets, as described further herein, Plaintiffs would have not had any interest in the scheme perpetrated by Defendants.

55. Plaintiffs' investments in Splinterlands were substantial. In fact, in an email on October 17, 2019, Rosen acknowledged that Mr. Carty was the "largest investor" in the company at that time.

## *Defendants' Fraudulent Misrepresentations*

56. The motivation behind Plaintiffs' initial involvement was to help and get involved with fully decentralized blockchain applications related to gaming – because that is what Defendants claimed Splinterlands to be.

57. Plaintiffs were inspired by and interested in the expansion of this new technology into new spaces, where their application could provide a new arena for the rapidly growing use of this blockchain technology.

58. However, Plaintiffs eventually came to learn that Defendants intentionally marketed and misrepresented Splinterlands as a "crypto game," utilizing buzz words in order to deceive, trick and induce potential "investors" such as Plaintiffs into thinking it was a crypto game.

59. Defendants' intended purpose was merely to induce the public, such as Plaintiffs, into making purchases in their Splinterlands game and to profit from those purchases, without delivering any real product at all, let alone the product they had promised or represented.

60. Rather than offering actual *fully decentralized* tokenized cards, Defendants simply sold Plaintiffs *access* to Defendants' *centralized* database – a material and significant difference in the world of blockchain technology and cryptocurrency.

61. In reality, Plaintiffs *never* had ownership in the way that Defendants defined ownership – or in a way that ownership could be defined.

62. Rather than actually *owning* or *controlling* the "cards" in the way Defendants claimed they would, Plaintiffs merely purchased access to a centralized server fully owned and controlled by Defendants – but access which Defendants could (and did) remove according to their own will.

63. Practically speaking, this meant that Defendants could cut off Plaintiffs' access to their cards at any time – which in fact, they did.  In one instance, Defendants forced individuals such as the Plaintiffs to use the Hive platform in order to access their "cards," which would have been impossible had the "cards" truly been what Defendants had represented them to be.

64. This lawsuit arises out of Defendants' breaches of their promises, in addition to their extraneous fraudulent misrepresentations, including but not limited to the following:

    a.  That Splinterlands was a blockchain game;

    b.  That Splinterlands was a fully decentralized application;

    c.  That the playing "cards" offered on Splinterlands were fully decentralized non-fungible tokens ("NFTs").

65. Eventually, Plaintiffs came to realize that Defendants were running a centralized application to fraudulently induce and trick people into investing into their game.

66. In reality, the assets of the Splinterlands game are not stored on the blockchain.  The only data stored on the blockchain consist of lists of transactions, after the results are created on Defendants' own centralized servers.

67. Through their scheme and misrepresentations, Defendants were able to trick countless individuals, including Plaintiffs, many of whom invested over $100,000.00 in justifiable reliance on Defendants' false and fraudulent claims, into thinking that they were purchasing NFTs.

68. In fact, what Defendants sold to Plaintiffs, and anyone who was similarly deceived, was the illusion that they *owned* cards.

69. Plaintiffs bring this lawsuit to recover their own losses – and to stop Defendants from continuing to deceive and defraud others.

### *Splinterlands was Neither a Decentralized Application ("dAPP") nor a Blockchain Game*

70. Plaintiffs originally made their purchases in Splinterlands based upon Defendants' description of Splinterlands.

71. However, Splinterlands was merely a centralized database where the "cards" were stored and accessed *via a* blockchain – a material and significant distinction with practical consequences.

72. The significance of the distinction is that Defendants had complete control of the database, as well as the ability to make edits to it – thereby giving them the ability to artificially alter the value of the digital assets – which would have never been possible had those assets been what Defendants represented them to be.

73.  By its very nature, a decentralized application is inherently trustworthy with its integrity maintained by the digital technology itself.  Based on Defendants' statements, Plaintiffs believed that they were investing in a fully decentralized application, which could not be edited.

74. Defendants' deception began when on February 28, 2019, Reich informed Jared Carty that he had developed a fully decentralized exchange, or "DEX", stating:

*Dex goes up Monday/Tuesday. We built our token on our own dex. We'll start raising money in earnest starting Tuesday.*

*we have a registered security with the SEC*

*...we chose to do a schedule D reg 504 security. It means we've given notice to the SEC that we're going to sell a security, and as long as we raise under $5M/yr we are legally allowed to raise funds without the full requirements of a listed security*

*so, we're legal, and still under the radar*

*...it'll be traded on teh* [sic] *exchange we built*

*steem-engine.com*

75. Jared Carty then asked Reich whether he was "talking about building your own market to trade your own stock?" In response, Reich stated:

*that's exactly what I'm talking about*
*and it's decentralized*
*people can make their own tokens*
*and list them*

76. Further, the Splinterlands.com website stated, at all times material hereto:

*"Splinterlands is a decentralized collectible card game built on blockchain technology..."*

77. Contrary to the representations, Splinterlands is *not* fully decentralized.  Rather, the game and its digital assets are stored on a centralized database controlled by Defendants, and

do not function as a true fully decentralized application on the blockchain.  As a result, Defendants can and have changed the value these digital assets at will.

78. Moreover, fully decentralized applications, also known as "dApps," cannot fail – as they are fully decentralized all over the world.  Splinterlands, on the other hand, is dependent upon Defendants' database and would fail if Defendants' database were to go down.

<u>June 2020 Migration from Steem Blockchain to Hive Blockchain</u>

79. In June 2020, Splinterlands replaced Steem, the blockchain that they had previously used to offer access their centralized database, with Hive, an alternate blockchain.

80. The significance of this change was that with a truly fully decentralized database, this change would not have been possible.  In fact, by making this change, Defendants prevented Plaintiffs from accessing the database as they had before – and cut off the access of Plaintiffs (and others) to the digital assets that they supposedly "owned."

81. By making the change, Defendants effectively prevented Plaintiffs from accessing what they had been led to believe was their own property and from playing Splinterlands as they had been up until that point.

82. Plaintiffs, and all Splinterlands players, were therefore unable to collect any of their gains by playing the "cards" – which resulted in Plaintiffs having to incur extra costs to rewrite the "bots" that they had previously been utilizing to play the game.

83. If Splinterlands were *actually* what Plaintiffs had represented it to be and if Splinterlands' records had *actually* been stored on the blockchain, this migration would not have been possible.

84. The very act of the migration from Steem to Hive demonstrated conclusively that Defendants had been misrepresenting the nature of the Splinterlands game and the assets associated with Splinterlands.

85. In a June 2020 email, Rosen attempted to justify and repair the damage caused by the transition and offer solutions, stating the following:

> *Yesterday the game migrated off of the Steem blockchain to the Hive blockchain. Since Hive is a fork of Steem, in most cases everything was transferred over with no issues; however, in certain cases there were problems that need to be addressed manually. I can't say for sure if that's what happened in your case without knowing to what account you're referring.*
>
> *...Nothing has been taken away from anyone; however, since the game has now migrated to the Hive blockchain, a Hive blockchain account is required to perform any transactions in the game or with the game assets. If you would like, I can work with you to have the cards transferred to an Ethereum wallet as ERC-721 tokens where they can then be transferred or sold without interacting with the Hive blockchain, but this would at the minimum require the transactions to send the cards be broadcast to the Hive blockchain and signed with your private keys.*

86. Rosen's statement confirmed that Defendants had defrauded Plaintiffs, had lied and did not sell them what they had promised.

87. Defendants had all along misrepresented Splinterlands "assets" to be blockchain-verifiable digital assets that existed beyond the immediate control of Defendants.

88. In reality, not only were the Splinterlands assets *not* on the blockchain and merely stored on Defendants' own centralized database, but Defendants had the ability to migrate their entire system and require a different blockchain to access Defendants' centralized database.

### *The Cards Purchased By Plaintiffs*
### *Were Not Fully Decentralized Non Fungible Tokens (NFTs)*

89.  At all times material hereto, Defendants falsely and repeatedly claimed that they were

enabling the creation of "non-fungible tokens" (NFTs) – and that they were bringing

together the world of gaming into the future of blockchain technology.

90.  As recently as June 23, 2020, Reich emailed Jared Carty, stating "the cards are

considered non-fungible tokens ("NFT")".

91.  Reich's claims were fraudulent, misleading and completely false.

92.  NFTs are only created and stored on blockchain.

93.  NFTs are unique and *cannot be altered.*  Their identity is defined solely by computer

code - not humans.  The reliability of NFTs is a function of technology - rather than the

behavior of human actors.

94.  The purpose and value of a true NFT is that the code is the only method of trust and

verification.

95.  Each individual NFT is different and can have its own properties.

96.  An NFT stores the asset and ownership details which enables the owners and future

buyers to be assured about the history of the NFT.

97.  NFTs are used to create verifiable digital scarcity, as well as digital ownership, which

means that someone can create an asset and the quantity of that asset can be verified on

the blockchain at any time.

98.  The rules for the NFT are set by math when the NFT is created. Because of the nature of

the blockchain, the NFT cannot be edited and possesses verifiable digital scarcity.

99.  NFTs are associated with the "address" (or account) of the owner – so anyone can "see"

who owns them.  However, only the person with the crypto "keys" to that address (or

account) are able to move the NFT to a new owner. This ability to move something on the blockchain is the method of proof of ownership in cryptocurrency.

100.     True NFTs can be used on many different platforms at the same time because they are on a blockchain and be incorporated into different games or applications. If the issuer of an NFT disappeared, a true NFT would still be on the blockchain and could be used for a second game.

101.     Defendants claimed that they were selling "cards" that were NFTs – but these claims were false.

102.     On March 2, 2020, Rosen acknowledged that Splinterlands assets were *not* fully decentralized. In an email to Jared Carty, Rosen stated as follows:

*"On a completely unrelated personal note, as much as I wanted to believe that you and other bitcoin maximalists were wrong, it's pretty clear now that you're right. I guess a lot of it comes down to the fact that the creator [of Bitcoin] is unknown and is not using it as a method for profit. No other blockchain or token has that and I guess that's why Bitcoin is what it is. Initially I had a vision for a decentralized game, where the stakeholders and the top players would control the direction and make the decisions, but that got lost in the fact that we didn't have the resources to really build that and that the vast majority of people involved don't really care about that and just want more features and more rewards and like to tell themselves that it's "decentralized" when it's not. I'm pretty disillusioned with the entire space – other than Bitcoin itself – and I just hope that one day I will be in a position similar to yours where I have the resources to really build something different and don't have to always answer to everyone else."*

103.     Plaintiffs purchased the Splinterlands "cards" – based on Defendants' misrepresentation that the cards were fully decentralized NFTs and a fully decentralized crypto asset that Plaintiffs would own and control.

104.     In reality, Defendants were simply selling serial numbers in their own personal database – and falsely representing them to be something they were not.

105.     These misrepresentations had real practical consequences, including but not limited to the following:

    a.   Defendants had the ability to (and did) alter and edit the "cards" – adding and taking away features according to their own wishes.

    b.   Plaintiffs were unable to, although they should have been able to, simply take the cards and make a new game.

    c.   Defendants retained the ability to do various things, such as change the value and owners of the cards.

106.    While falsely claiming their "cards" were NFTs, Defendants designed the "cards" so that Defendants could control the Splinterlands game.  In reality, Defendants did not want people making their own "cards" to be played in their game – or taking their "cards" to be used in other games.

107.    Defendants wanted control of the cards and the game.  With true NFTs, Defendants would have never had that control.

108.    Rather than truthfully describe what they were offering, Defendants made fraudulent claims, designed to induce purchasers like Plaintiffs into buying Splinterlands "cards" and into justifiably believing that they could own and control their "cards."

109.    For Plaintiffs, the entire purpose of purchasing true NFTs was to have a part of all future games that would also build on the NFTs – which could have resulted in a significant profit to Plaintiffs.

110.    What Plaintiffs purchased, however, was nothing of the sort.  Because the Splinterlands "cards" were not NFTs, Defendants, and not Plaintiffs, had all of the power over the "cards" Plaintiffs believed they had purchased.

*Defendants Altered Plaintiffs' Cards*

111.    Defendants repeatedly took it upon themselves to alter Plaintiffs' Splinterlands "cards," and entire classes of the "cards" - to devalue them for purposes of the game.

112.    This action should have been outside of the capability of Defendants, if the cards had been what Defendants described them to be.

113.    By way of example and not limitation, Plaintiffs purchased a "card" in a particular class of "cards" ("Prince Julian") that had added abilities that made the "card" worth more for purposes of the Splinterlands game.

114.    However, Rosen arbitrarily "took away" that ability, making the card worth less, which would have **never been possible with a true NFT.**

115.    In exchange for Plaintiffs' agreement to forego approximately $5,000.00 of "cards" from Splinterlands to which Plaintiffs were entitled, Rosen had previously made the Prince Julian card powerful.  However, Rosen, in concert with the other Defendants, then "cut down" the Prince Julian card, without then reconciling the $5,000.00 value that was owed to Plaintiffs.  Rosen, in concert with the other defendants, did this by editing Defendants' centralized database – and Plaintiffs had no ability to stop it.

116.    Defendants' actions made the Prince Julian card significantly less powerful in the Splinterlands game and thus, worth less money.

117.    True NFTs, on the other hand, are *non-fungible* and cannot be edited after the fact. NFTs do not need to pull data from a centralized database to know their characteristics.  The fact that Defendants devised a system where they were able to edit whole classes of cards proved that the Splinterlands "cards" were *not* NFTs.

118.    Rosen discussed the actions he took by email to Jared Carty on January 4, 2020.

*Hi Jay, I just wanted to let you know that we are going to need to adjust the stats on the Prince Julian card. While we had initially thought the card might be underpowered, it turns out the opposite is true and the card is dominant and nearly unbeatable in low mana cap matches. We plan to remove the -1 health debuff and have him just be a 2 mana cost dragon summoner, which I expect will still make him a very strong and valuable card. We will be announcing this change very soon, but I just wanted to give you a heads up first.*

119.      In an email sent by Rosen that same day, Rosen made it clear that he is in

complete control of the value of the cards:

*"At no point did we agree that you would be able to design the stats for the card. In all cases where players design cards they are guiding the design of the card artwork and name. We are happy to take suggestions from the designing player on the stats of the card and discuss it with them, but ultimately the decisions on all of the stats and abilities for the cards are entirely up to us. Additionally, we have never agreed not to change the stats of cards in the game after release, in fact we have very explicitly stated that we absolutely will change the stats and/or abilities on any cards that we feel are necessary. Therefore there is no way that this change would be "infringing" on any of your rights or "rewriting" any agreements.*

*As for the data behind this decision, in the second half of the last season Prince Julian's win rate was 67.90%. This is compared to a 60.70% win rate for the second highest win rate summoner – Prince Rennyn. This is far, far too high and has created one of the most extreme outcries from the player base I have seen to date. I also do not think that the removal of the stat is an overcorrection. While changing the stat buff / debuff on the card to something else would likely lower the win rate somewhat, it would still almost certainly be too high and just put us right back into this same situation. Even without any stat adjustments it will still be the only 2 mana dragon splinter summoner in the game, and that makes it a very useful and valuable card, commensurate with its rarity."*

120.      Defendants, in reality, were picking the people who would win the "battles" on

Splinterlands and *not* letting it be random. Once Plaintiffs realized this, they investigated

other aspects of the "game" and the "lottery" being conducted by Defendants.

121.      Upon realizing the true nature of Defendants' deceitful scheme, Plaintiffs asked

for their money back. Defendants refused.

122.      Defendants have defrauded Plaintiffs and countless others into spending their

money on a game that was *not fully* decentralized and into purchasing cards that were *not*

NFTs.

123.     Defendants' scheme was nothing more than a glorified scam designed to entice

cryptocurrency enthusiasts into investing into a "market" solely controlled by

Defendants.  Defendants intended to profit off of this deception – and they continue to do

so as of the filing of this Amended Complaint.

### *Plaintiffs' Damages*

124.     As a result of Defendants' fraud, Plaintiffs wasted time and money buying into a

game in order to support crypto currency and blockchain based gaming.

125.     Plaintiffs invested their resources on a game that was not a crypto game at all –

but was merely a scheme pretending to be fully decentralized and blockchain based.

126.     In addition to the money spent on Splinterlands, Plaintiffs spent time and money

building and testing custom code for the Splinterlands game, paying outside programmers

and paying for servers and hardware to support their efforts to develop an effective

strategy on Splinterlands – all based on the justifiable belief that these efforts would have

resulted in gains from the game.  Had Defendants' representations not been fraudulent

and false, Plaintiffs' efforts would not have been in vain.

127.     Plaintiffs and a core team of individuals spent thousands of hours on Splinterlands

building custom software to be able to interact with and compete on the Splinterlands

game. They developed highly skilled automated playing bots that have won a significant

amount of tournaments and reached the highest score on the two week long "seasons."

As part of these efforts, Plaintiffs hired support staff and had outside programmers write

code.

128.     Plaintiffs' costs exceeded $250,000.00, *in addition to* the $250,000.00 they

initially spent purchasing the digital assets from Defendants.

129.     Plaintiffs have also been damaged in the diminishment of the value of the "cards" that they *did* purchase.  Plaintiffs have attempted to mitigate their damages by selling the "cards" and converting the cards that do not sell for DEC. As part of their claim, Plaintiffs seek damages equal to the difference between what they paid and the sale price of the cards.

130.     Plaintiffs also seek damages from Defendants equal to the value of the unopened packs of "cards" and for the lost value from tournaments, daily rewards, DEC rewards, and season end rewards that they would have earned, but for Defendants' unlawful conduct.

131.     While Defendants originally allowed Plaintiffs and others to sell their "cards" for actual cryptocurrency, that ability has now also been taken away, so that Defendants can ensure that Defendants can directly profit through the sale of Splinterlands cards.

132.     Plaintiffs also seek damages in the amount that Defendants have and will profit from Plaintiffs selling their Splinterlands "cards."

133.     When Plaintiffs sell Splinterlands "cards," Defendants are paid in USD, through Paypal (which Defendants keep).  Defendants then pay Plaintiffs in DEC – which is worthless.  Defendants should not be permitted to profit from these ill-gotten gains.  Had the Splinterlands cards been *actual* NFTs, Plaintiffs would have been able to sell them for actual cryptocurrency – either within Splinterlands or elsewhere.

## COUNT I

## BREACH OF CONTRACT

134.     Plaintiffs incorporate by reference the foregoing paragraphs of this Amended

Complaint as if fully set forth herein.

135.     Plaintiffs purchased the Splinterlands "cards" and Dark Energy Crystals from the

individual defendants, Reich and Rosen. in certain transactions in exchange for payment

by Plaintiffs to defendants individually.

136.     In other instances, Plaintiffs purchased the Splinterlands "cards" and Dark Energy

Crystals from Steem Monsters Corp. in exchange for payment by Plaintiffs to Steem

Monsters Corp.

137.     In each circumstance, the agreement was that Plaintiffs would purchase cards

described by Reich and Rosen to Plaintiffs as "non-fungible tokens (NFTs) with real

monetary value."

138.     The Splinterlands cards sold to Plaintiffs in the subject transactions were not

NFTs, as promised by Defendants, constituting a breach of the aforementioned

agreements.

139.     As for the Dark Energy Crystals (DEC), the agreement was that Plaintiffs would

be purchasing a cryptocurrency token that could be "bought, sold and transferred."

140.     The DEC sold to Plaintiffs by Reich, Rosen and Steem Monsters Corp. were not

cryptocurrency tokens, as promised, constituting a breach of the aforementioned

agreement.

141.     Due to the inherent opacity and nature of the cryptocurrency transactions, which

were designed and structured by Defendants themselves, certain details regarding the

transactions, such as the destination/recipient of the payments, are only known to Defendants, who possess and control all of the relevant information.

142.     Defendants breached the aforementioned contracts, and failed to deliver the NFTs or cryptocurrency tokens they promised to sell.

143.     As a direct and proximate cause of the foregoing, Plaintiffs have suffered and will continue to suffer damages in an amount to be determined at trial, which damages are ongoing and continue unabated.

**WHEREFORE**, Plaintiffs respectfully requests that this Court enter judgment for damages in their favor and against Defendants, jointly and severally, in the amount to be determined by the Court, in excess of $75,000.00, actual damages, punitive damages, plus attorneys' fees, plus pre- and post-judgment interest. Plaintiffs further request such further and other relief in their favor as this Court deems proper and just.

## COUNT II

## UNJUST ENRICHMENT

### (IN THE ALTERNATIVE TO BREACH OF CONTRACT)

144.     Plaintiffs incorporate by reference the foregoing paragraphs of this Amended Complaint as if fully set forth herein.

145.     At all materials times hereto, Defendants benefited from the ill-gotten gains of their improper and unlawful scheme, as more fully set forth herein.

146.     As a result, Defendants have received significant funds and other gains from Plaintiffs and have been unjustly enriched at the expense of Plaintiffs, thus entitling Plaintiffs to damages.

147.     If the Court finds that no contract existed between Plaintiffs and Defendants, then

Plaintiffs seek recovery under the theory of unjust enrichment.

148.     To the extent that the Court finds that no contract existed between Plaintiffs and

Defendants, Plaintiffs have no adequate remedy at law and injustice can only be avoided

by compelling Defendants to compensate Plaintiffs for damages in an amount to be

determined at trial.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their

favor and against Defendants, jointly and severally, for rescission of the transactions into which

Plaintiffs were fraudulently induced, costs associated with effecting rescission, disgorgement of

all monies, profits and gains unjustly realized or that may be realized as a result of Defendants

fraudulent conduct, actual damages, punitive damages, plus attorneys' fees, plus pre- and post-

judgment interest. Plaintiffs further request such further and other relief in their favor as this

Court deems proper and just.

## COUNT III

## NEGLIGENT MISREPRESENTATION

149.     Plaintiffs incorporate by reference the foregoing paragraphs of this Amended

Complaint as if fully set forth herein.

150.     As described in detail herein, Defendants misrepresented material facts regarding

the nature of the Splinterlands assets which they offered to Plaintiffs for purchase.

151.     The statements attributed to both Reich and Rosen herein are attributable to them

both *personally* and in their capacity as representatives of Steem Engine and Steem

Monsters.

152.     The misrepresentations were made under circumstances where Defendants, as the offerors and creators of the platforms, knew or ought to have known of the falsity is the misrepresentations made.

153.     Defendants made the misrepresentations with the intent to induce Plaintiffs into investing in Splinterlands and making purchases, as described herein.

154.     Plaintiffs acted in justifiable reliance on Defendants' misrepresentations and as a result, Plaintiffs have suffered and will continue to suffer damages in an amount to be determined at trial, which damages are ongoing and continue unabated.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, jointly and severally, for rescission of the transactions into which Plaintiffs were fraudulently induced, costs associated with effecting rescission, disgorgement of all monies, profits and gains unjustly realized or that may be realized as a result of Defendants fraudulent conduct, actual damages, punitive damages, plus attorneys' fees, plus pre- and post-judgment interest. Plaintiffs further request such further and other relief in their favor as this Court deems proper and just.

## COUNT IV

## FRAUD

155.     Plaintiffs incorporate by reference the foregoing paragraphs of this Amended Complaint as if fully set forth herein.

156.     In furtherance of their unlawful and fraudulent scheme described herein, Reich and Rosen, both in their personal capacity, and in their capacity as representatives of both Steem Engine and Steem Monsters, made numerous misrepresentations to Plaintiffs, which were material to the transaction at hand, and deceived Plaintiffs into believing the following, each of which turned out to be false:

    a.  That the playing "cards" offered on Splinterlands were fully decentralized;

    b.  That Splinterlands was a blockchain game;

    c.  That Splinterlands was a fully decentralized application;

    d.  That Splinterlands was an SEC-approved fully decentralized blockchain application.

    e.  That Splinterlands was an SEC approved company.

157.    The aforesaid misrepresentations were false, and knowingly and intentionally made by Reich and Rosen as part of conversations extraneous to the agreements to purchase NFTs and DEC tokens.

158.    Reich and Rosen knew, or recklessly disregarded the fact that these misrepresentations would mislead Plaintiffs and that Plaintiffs would act in reliance upon them in deciding to purchase the NFTs and DEC tokens from Reich and Rosen – and from Steem Monsters Corp.

159.    Reich's and Rosen's conduct, in their individual capacities and in their capacity as representatives of Steem Engine Corp. and Steem Monsters Corp. were intended to *induce* Plaintiffs to enter into the aforementioned contracts – conduct which is separate and distinct from the identified *breaches* of said contracts.

160.    Plaintiffs in fact *did* reasonably rely on Defendants' misrepresentations and omissions.

161.    As a direct and proximate cause of the foregoing, Plaintiffs have suffered and will continue to suffer damages in an amount to be determined at trial, which damages are ongoing and continue unabated.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, jointly and severally, for rescission of the transactions into which Plaintiffs were fraudulently induced, costs associated with effecting rescission, disgorgement of all monies, profits and gains unjustly realized or that may be realized as a result of Defendants fraudulent conduct, actual damages, punitive damages, plus attorneys' fees, plus pre- and post-judgment interest. Plaintiffs further request such further and other relief in their favor as this Court deems proper and just.

## COUNT V

## CIVIL CONSPIRACY

162.    Plaintiffs incorporate by reference the foregoing paragraphs of this Amended Complaint as if fully set forth herein.

163.    Reich and Rosen formed and operated a malicious conspiracy with a common purpose to injure Plaintiffs by engaging in overt and unlawful acts including, without limitation fraud, misrepresentation, breach of contract and other conduct, as detailed herein, that violated the contractual, statutory and common law rights of Plaintiffs, causing actual harm to Plaintiffs.

164.    Reich and Rosen formed, operated and conducted business through Steem Monsters Corp. and Stem Engine Corp. with Plaintiffs, and others, designing payment transactions and systems in order to obfuscate the source and nature of the transactions into which they entered.

165.    Reich and Rosen intentionally designed these transactions to be complex, through several interrelated entities, in order to conceal and disguise their fraud and to prevent

Plaintiffs from having the information necessary to determine with whom they were dealing and to whom responsibility would be attributed for the underlying transactions.

166.     Reich and Rosen communicated in unison and in conjunction with one another at all times material hereto, as plead in detail herein, coordinating their efforts and entities in order to advance the conduct complained of herein by Plaintiffs.

167.     By virtue of the formation and operation of this conspiracy by Defendants, and as a consequence of the above-described wrongful acts and conduct and the harm and injury caused to Plaintiffs, each Defendant as a participant in this conspiracy is liable as a joint tortfeasor for each and every one of the acts described herein.

168.     These allegations are made based upon information available to Plaintiffs as of the filing of this Amended Complaint.

169.     As a direct and proximate cause of the foregoing, Plaintiffs have suffered and will continue to suffer damages in an amount to be determined at trial, which damages are ongoing and continue unabated.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, jointly and severally, for rescission of the transactions into which Plaintiffs were fraudulently induced, costs associated with effecting rescission, disgorgement of all monies, profits and gains unjustly realized or that may be realized as a result of Defendants fraudulent conduct, actual damages, punitive damages, plus attorneys' fees, plus pre- and post-judgment interest. Plaintiffs further request such further and other relief in their favor as this Court deems proper and just.

## COUNT VI

## VIOLATION OF THE PENNSLYVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW, 73 P.S. § 201-1 et seq.

170.     Plaintiffs incorporate by reference the foregoing paragraphs of this Amended Complaint as if fully set forth herein.

171.     Plaintiffs are consumers who contracted with Defendants to purchase goods for their personal purposes.

172.     Defendant violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law, codified at 73 P.S. § 201-1 et seq., in that Defendants:

    a.  Did not deliver the goods/services that they promised to deliver (or *any* good with any value);

    b.  Represented that the goods or services had characteristics, uses and/or benefits that they do not have; and/or

    c.  Represented that the goods or services were of a particular standard, quality or grade when they are of another; and/or

    d.  Engaged in fraudulent and/or deceptive conduct creating the likelihood of confusion or misunderstanding.

173.     As defined by the Pennsylvania Unfair Trade Practices and Consumer Protection Law, Defendants conducted deceptive acts or practices.

174.     As set forth in detail herein in Plaintiffs' recitation of the facts, Plaintiffs justifiably relied upon Defendant's deceptive acts or practices.

175.     Plaintiffs' justifiable reliance upon Defendant's deceptive acts or practices was to Plaintiffs' detriment.

176.     As a direct and proximate result of the deceptive actions by Defendants under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, Plaintiffs have incurred substantial damages.

177.     Plaintiffs' damages extend well beyond the failure to receive the "benefit of the bargain."  Those details include, *inter alia*:

    a.   The direct profit Defendants have enabled themselves to earn directly through the sale of Splinterlands cards;

    b.   The direct profit that Defendants have enabled themselves to earn through any transactions where Plaintiffs sell their Splinterlands "cards."

178.     Pursuant to the Pennsylvania Unfair Trade Practices and Consumer Protection Law, Plaintiffs are entitled to actual damages, treble damages, costs of suit, and attorneys' fees incurred in the prosecution of this litigation.

**WHEREFORE**, Plaintiffs respectfully requests that this Court enter judgment for damages in their favor and against Defendants, jointly and severally, in the amount to be determined by the Court, in excess of $75,000.00, for all damages available under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, including but not limited to actual damages, treble damages, costs of suit, and attorneys' fees incurred in the prosecution of this litigation.

## COUNT VII

## PIERCING CORPORATE VEIL

179.     Plaintiffs incorporate by reference the foregoing paragraphs of this Amended
Complaint as if fully set forth herein.

180.     Plaintiffs seek to hold Reich and Rosen personally responsible for conduct
attributable to their own transactions and to hold Reich and Rosen responsible for the
conduct attributed to Steem Engine Corp. and Steem Monsters Corp., for the reasons set
forth herein, which Plaintiffs intend to prove during discovery.

181.     Reich and Rosen own all or substantially all of the capital stock of Steem Engine
Corp. and Steem Monsters Corp. and potentially other entities engaged in the unlawful
conduct referenced herein.

182.     Reich and Rosen totally dominate and control both Steem Engine Corp. and
Steem Monsters Corp. and receive the benefits of ownership and both of those entities.

183.     Reich and Rosen have failed to adhere to corporate formalities with respect to the
operations either Steem Engine Corp. or Steem Monsters Corp. by, *inter alia*,

   a.   Commingling the funds of Steem Engine Corp. and/or Steem Monsters Corp. with
their own personal funds and with their other affiliates without sufficient
consideration or *any* consideration or regard for the separation or corporate
existence of either Steem Engine Corp. or Steem Monsters Corp.;

   b.   Conducting transactions in the name of Steem Engine Corp. and Steem Monsters
Corp., but actually transferring and transacting cryptocurrency owned *personally*
by Reich and Rosen, thereby utilizing Steem Engine Corp. or Steem Monsters

Corp. merely as conduits for their own personal transactions, unbeknownst to Plaintiffs;

c.  Siphoning of funds, through transactions conducted utilizing cryptocurrency, from Steem Engine Corp. or Steem Monsters Corp. to themselves, in order to disguise and conceal the fraud they perpetrated upon Plaintiffs and others;

d.  Failing to properly adhere to their obligations with respect to securities filings and regulatory registrations;

e.  Adhering to any KYC /AML procedures and related compliance protocols to obtain and verify identifying information (such as legal name or 'accredited investor' status) on game/market participants;

f.  Failing to file the required annual updates with the Securities and Exchange Commission to disclose the identity of their executives;

g.  Failing to file required annual updates regarding additional funding, and

h.  Claiming in corporate filings that Steem Engine Corp. has "no officers" and "no directors".

184.    By way of example and not limitation, on July 3, 2019, while conducting transactions with Plaintiffs on behalf of Steem Engine Corp. or Steem Monsters Corp., Reich and Rosen instructed Plaintiffs to send $63,000.00 worth of Bitcoin to an address/account, which *personally* belonged to Reich and Rosen.

185.    Reich and Rosen have abused the corporate forms of both Steem Engine Corp. and Steem Monsters Corp. by using those entities in conjunction with the inherent opacity of cryptocurrency transactions in order to conduct business with Plaintiffs in such

a manner so as to obscure the fraud that Reich and Rosen perpetrated upon Plaintiffs and others.

186.    Steem Engine Corp. or Steem Monsters Corp. have been operated in such a manner such that they are nothing more than a façade for the operations of both Reich and Rosen.

187.    Accordingly, the corporate/entity veils of Steem Engine Corp. and Steem Monsters Corp. should be pierced so that all of the Defendants may be jointly and severally liable to Plaintiffs in this action.

**WHEREFORE**, Plaintiffs respectfully requests that this Court enter judgment for damages in their favor and against Reich and Rosen, jointly and severally, in the amount to be determined by the Court, in excess of $75,000.00, actual damages, punitive damages, plus attorneys' fees, plus pre- and post-judgment interest. Plaintiffs further request such further and other relief in their favor as this Court deems proper and just.

**GARIBIAN LAW OFFICES, P.C.**
*/s/ Antranig Garibian*_____
Antranig Garibian, Esquire, I.D. No. 94538
1800 John F. Kennedy Boulevard, Suite 300
Philadelphia, PA  19103
(215) 326-9179
ag@garibianlaw.com
*Attorneys for Plaintiffs*